## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>           Plaintiff,<br><br>v.<br><br>QUEEN SHOALS, LLC,;<br>QUEEN SHOALS II, LLC;<br>SELECT FUND, LLC;<br>SIDNEY STANTON HANSON; and<br>CHARLOTTE M. HANSON.<br><br>           Defendants, and<br><br>SECURE WEALTH FUND, LLC;<br>HERITAGE GROWTH FUND, LLC;<br>DOMINION GROWTH FUND, LLC;<br>TWO OAKS FUND, LLC;<br>DYNASTY GROWTH FUND, LLC; and<br>QUEEN SHOALS GROUP, LLC.<br><br>           Relief Defendants | CASE NO. 3:09-cv-335 |

## CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

## I.

## INTRODUCTION

On August 4, 2009, the U. S. Commodity Futures Trading Commission ("Commission" or "CFTC")

filed a Complaint in this civil action against defendants Queen Shoals, LLC ("Queen Shoals"); Queen

Shoals II, LLC ("QS II"); Select Fund, LLC ("Select Fund"); Charlotte M. Hanson ("C. Hanson"); and

Sidney Stanton Hanson ("Hanson") (collectively "Defendants"), and relief defendants Secure Wealth Fund,

LLC; Heritage Growth Fund, LLC; Dominion Growth Fund, LLC; Two Oaks Fund, LLC; Dynasty Growth

Fund, LLC; and Queen Shoals Group, LLC (collectively, the "Relief Defendants"). The Complaint seeks injunctive and other legal and equitable relief for violations of certain antifraud provisions of the Commodity Exchange Act ("Act"), as amended, 7 U.S.C. § 1 *et seq.* (2006).

## II.

## CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the Complaint without a trial on the merits or any further judicial proceedings, Defendants and Relief Defendants:

1. Consent to the entry of this "Consent Order of Settlement, Permanent Injunction, and Other Equitable Relief (hereinafter "Order"):

2. Affirm that they have read and agree to this Order voluntarily, and that no promise or threat has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Order, other than as set forth specifically herein.

3. Acknowledge proper service of the Summons and Complaint.

4. Admit that this Court has jurisdiction over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2).

5. Admit that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006).

6. Waive: (a) all claims that they may possess under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or Part 148 of the Commission's Regulations ("Regulations"), 17 C.F.R. §§ 148.1, *et seq.* (2009), relating to, or arising from, this action; (b) all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act, Pub. L. 104-121, §§ 221-223, 110 Stat. 862-63 (1996), as amended by Pub .L. 110-28, 121 Stat. 112 (2007), relating to, or

arising from, this action; (c) any claim of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief; and (d) all rights of appeal in this action;

7.     Consent to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Order and for any other purpose relevant to this action.

8.     Agree that they and their agents, servants, employees, contractors and attorneys shall not take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or Findings of Fact or Conclusions of Law contained in this Order, or creating, or tending to create, the impression that the Complaint or this Order is without a factual basis; provided, however, that nothing in this provision shall affect Defendants' and Relief Defendants': (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party. Defendants and Relief Defendants shall take all necessary steps to ensure that all of their agents, servants, employees, contractors and attorneys understand and comply with this agreement;

9.     By consenting to the entry of this Order, Defendants and Relief Defendants neither admit nor deny the allegations of the Complaint or the Findings of Fact and Conclusions of Law contained in this Order, except as to jurisdiction and venue, which they admit; however, Defendants and Relief Defendants agree and intend that the allegations of the Complaint and all of the Findings of Fact and Conclusions of Law made by this Court and contained in Part III of this Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of: any current or subsequent bankruptcy proceeding filed by, on behalf of, or against any of the Defendants or Relief Defendants; any proceeding to enforce this Order; and/or any proceeding pursuant to Section 8a of the Act, 7 U.S.C. § 12a(1) (2006), and/or Part 3 of the Regulations, 17 C.F.R. §§ 3 *et seq.* (2009).

10.     Defendants and Relief Defendants shall provide immediate notice of any bankruptcy filed

by, on behalf of, or against them collectively and/or individually in the manner required by Part VI, paragraph 65 of this Order.

11.     No provision of this Order shall in any way limit or impair the ability of any person to seek any legal or equitable remedy against any of the Defendants and/or Relief Defendants or any other person in any other proceeding.

## III.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Order and that there is no just reason for delay. The Court therefore directs the entry of Findings of Fact, Conclusions of Law, permanent injunction, and equitable relief, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), as set forth herein.

**A.     The Parties**

12.     **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2006), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2009).

13.     **Defendant Queen Shoals, LLC** is a Nevada limited liability company founded and formed by C. Hanson and Hanson on August 29, 2006, with its claimed principal place of business listed as 312 West Fourth Street, Carson City, Nevada 89703. Queen Shoals does not appear to maintain any physical offices in Nevada; rather, it operates out of offices located at 8520 Cliff Cameron Drive, Suite 150, Charlotte, North Carolina 28269. Queen Shoals has never been registered with the CFTC in any capacity. Queen Shoals is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

14. **Defendant Queen Shoals II, LLC** is a Delaware limited liability company founded and formed

by Hanson on or about March 5, 2008 with its claimed principal place of business listed as 16192 Coastal Highway, Lewes, Delaware 19958. QS II does not appear to maintain any physical offices in Delaware; rather, it operates out of offices located at 8520 Cliff Cameron Drive, Suite 150, Charlotte, North Carolina 28269. QS II has never been registered with the CFTC in any capacity. QS II is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

15. **Defendant Select Fund, LLC** is a Delaware limited liability company founded and formed by Hanson on or about October 14, 2008 with its claimed principal place of business listed as 16192 Coastal Highway, Lewes, Delaware 19958. Select Fund does not appear to maintain any physical offices in Delaware; rather, it operates out of offices located at 8520 Cliff Cameron Drive, Suite 150, Charlotte, North Carolina 28269. Select Fund has never been registered with the CFTC in any capacity. Select Fund is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

16. **Defendant Charlotte M. Hanson** resides at 5919 Maple Street, Charlotte, North Carolina, 28269, a property owned by Queen Shoals. C. Hanson holds herself out as a managing director of Queen Shoals and QS II, and is the signatory on bank accounts held by Queen Shoals, QS II and Select Fund. C. Hanson has never been registered with the CFTC. C. Hanson is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is she an associated person of such entities.

17. **Defendant Sidney Stanton Hanson** resides at 5919 Maple Street, Charlotte, North Carolina, 28269, a property owned by Queen Shoals. Hanson holds himself out as the founder, owner, managing director, and manager of Queen Shoals, QS II and Select Fund. Hanson has never been registered with the CFTC. Hanson is not a financial institution, registered broker dealer, insurance company, financial holding

5

company, or investment bank holding company, nor is he an associated person of such entities.

18. **Relief Defendant Secure Wealth Fund, LLC** is a Delaware limited liability company founded and formed by Hanson on or about October 14, 2008 with its claimed principal place of business listed as 16192 Coastal Highway, Lewes, Delaware 19958. It is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

19. **Relief Defendant Heritage Growth Fund, LLC** is a Delaware limited liability company founded and formed by Hanson on or about October 14, 2008 with its claimed principal place of business listed as 16192 Coastal Highway, Lewes, Delaware 19958. It is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

20. **Relief Defendant Dominion Growth Fund, LLC** is a Delaware limited liability company founded and formed by Hanson on or about October 14, 2008 with its claimed principal place of business listed as 16192 Coastal Highway, Lewes, Delaware 19958. It is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

21. **Relief Defendant Two Oaks Fund, LLC** is a Delaware limited liability company founded and formed by Hanson on or about October 14, 2008 with its claimed principal place of business listed as 16192 Coastal Highway, Lewes, Delaware 19958. It is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

22. **Relief Defendant Dynasty Growth Fund, LLC** is a Delaware limited liability company founded and formed by Hanson on or about September 8, 2008 with its claimed principal place of business

listed as 16192 Coastal Highway, Lewes, Delaware 19958. It is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

23. **Relief Defendant Queen Shoals Group, LLC** is a Delaware limited liability company founded and formed by Hanson on or about September 25, 2008 with its claimed principal place of business listed as 16192 Coastal Highway, Lewes, Delaware 19958. It is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, nor is it an associated person of such entities.

**B.    Introduction**

24. Since at least June 18, 2008 to the present (the "relevant period"), Defendants have fraudulently solicited at least $22.5 million from individuals and/or entities for the purported purpose of trading off-exchange foreign currency ("forex" or "foreign currency"), among other things, on their behalf. The Defendants are misappropriating customer funds, using customer funds to pay undisclosed commissions to agents for finding new customers, sustaining millions in losses that are not disclosed to customers, issuing false account statements to customers, using funds from Queen Shoals Group customers to pay-off customers of a previous scheme operated by Hanson called the "Apollo Fund," and operating a "Ponzi" scheme.

25. In their solicitations to customers, the Defendants claim success in trading forex and other instruments, and guarantee profits to customers. The Defendants are operating a Ponzi scheme targeting customers at or near retirement who hold individual retirement accounts ("IRA"), and luring prospective customers with promises of annual returns of at least 8 to 24 percent while promising an "additional 1%" to customers who roll-over their IRAs.

26. The Defendants fail to advise customers that the Queen Shoals Group uses in excess of 30 agents

that are identified to customers as "consultants" to refer new customers, and that that these agents are paid an undisclosed commission of between 1% to 5% of the referred customer's principal investment. In addition, the Defendants are using the funds of current Queen Shoals Group customers to pay-off customers of a prior scheme operated by Hanson, the "Apollo Fund."

27. Throughout the relevant period, while providing quarterly account statements to customers representing that the Defendants are generating profits on customers' behalf, the Defendants are sustaining millions in losses and are misappropriating customers' funds for C. Hanson's and Hanson's personal use, for such things as luxury resort vacations, private plane rentals, daily living expenses, and to purchase an 88 acre farm, among other parcels of real property. Through the issuance of the monthly and annual statements to customers, the Defendants conceal their fraud, losses and misappropriation of customer funds.

28. Following the execution of a criminal search warrant upon the Defendants' business premises by special agents of the North Carolina Office of the Secretary of State, Securities Division ("NC SD") on May 28, 2009, the NC SD also issued a cease and desist order upon the Defendants, ordering them to stop their unregistered securities operations within the State of North Carolina.

**C.    The Fraudulent Scheme**

29. While this scheme has been described by the Defendants to customers in different ways, it involves the solicitation of customers for three types of investment or financial vehicles: 1) a "proprietary" off-exchange foreign currency trading program with "guaranteed" returns, which the Defendants refer to as "non-depletion accounts"; 2) Treasury bills; and 3) precious metals such as gold and silver bullion. Hanson, C. Hanson and the Queen Shoals Group purportedly generate profits to pay returns to customers that are negotiated with each customer via promissory notes that specifically reference the three above-described vehicles.

30. In their in-person, documentary, and website solicitations at *www.queenshoals.com*,

the Defendants claim success in trading forex, guarantee customers' returns and represent that there is no risk to customers' principal investment. Customers are told that they "loan" money to the Queen Shoals Group via "promissory notes" for the express purpose of allowing the Queen Shoals Group to pool the funds of all customers to trade forex, buy gold and silver bullion, and purchase Treasury bills.

31. Customers are told that some of these pooled funds are then turned over to forex traders working for the Queen Shoals Group that use "proprietary trading systems" to trade forex that are "extremely successful." Prospective customers are lured with promises of purported returns varying between 8 and 24 percent per annum. Customers are assured that the Queen Shoals Group has "100% liquidity," and that sufficient funds are on hand to return all customers' principal plus the guaranteed interest. The Defendants falsely represent that the use of what they term a "non-depletion" account guarantees the customer the safety of their principal and the promised annual "return."

32. Contrary to the Defendants' claims, the Queen Shoals Group's records seized by the NC SD and the Queen Shoals Group's bank records show little evidence of customer funds being used to trade forex offshore or via any of the following entities or their associated persons: financial institutions, registered broker dealers, insurance companies, financial holding companies, or investment bank holding companies. Rather, these records show that a small amount of customer funds are used to unsuccessfully trade forex, even less money is deposited into the Queen Shoals Group's bank accounts from third parties, and that nearly all of the money deposited into the Queen Shoals Groups' various bank accounts comes from deposits of IRA rollovers from new customers. It is these new customer funds that are used to pay "quarterly interest payments" to existing customers. These bank records and the other documents seized from the Defendants reveal that they are operating a Ponzi scheme that has brought in at least $22.5 million during the relevant period.

33. Based upon the representations on the Defendants' website *www.queenshoals.com*, the

documents handed out to potential customers, and the records seized by the NC SD, the focus of the purported forex trading is supposed to be conducted off-exchange foreign currency trading, mainly in currency pairs, on a leveraged basis.

34. The Defendants' agents, in a conversation taped by an undercover NC SD special agent, also claimed that the "primary focus" of the Queen Shoals Group's investments consists of "currency futures trading (sic) in the foreign exchange markets." Contrary to this claim, there is no evidence that the Defendants traded futures on U.S. exchanges.

35. The Defendants transfer customer funds to bank accounts in the name of the Relief Defendants and/or use customer money to purchase real and/or personal property in the names of the respective Relief Defendants. There is no evidence that the Relief Defendants provide the Defendants with any bona fide goods or services in return for said payments.

**D.    Payments to Undisclosed Agents**

36. Hanson advises customers that he is the owner, founder and manager of the Queen Shoals Group. Further, the Queen Shoals Group, through Hanson and C. Hanson, has established a network of "consultants," which are in reality agents, who work for the Defendants soliciting prospective customers. These agents solicit prospective customers in their homes or area restaurants, among other places. In at least one instance, the Defendants' agents gave a presentation to residents of a retirement community in South Carolina.

37. The agents are paid a commission between 1% and 5% of the customer's principal that is invested with the Defendants; the ultimate amount paid to agents depends upon the length of time the customer's money is "loaned" to the Defendants. Importantly, customers are not advised that the Defendants' agents are being a paid a commission of between 1% and 5% of the customer's principal that is invested with the Defendants, nor do these commission payments appear on any account statements sent to

customers. Based upon the records seized by the NC SD, these commission payments exceed one million dollars.

## E.  Misappropriation of Participant Funds

38.  Contrary to the Defendants' claims that they pool and then trade customer funds, they actually misappropriate some or all of customers' funds for Hanson's and C. Hanson's personal use, use Queen Shoals Group customers' funds to pay off customers of Hanson's prior schemes, and use subsequent customers' funds to pay purported profits or return principal to earlier customers. For example, the corporate bank records of QS II from Bank of America for account number xxxx xxxx 5614 demonstrate that the Defendants misappropriate customer funds to purchase, among other things:

- Private aircraft charters;
- International travel to, and shopping sprees in, Ireland;
- Resort vacations for Hanson and his wife;
- The purchase of various tracts of real estate in North Carolina and West Virginia, including an 88 acre farm in Iredell County, NC;
- Weekly dining outings;
- Rental cars;
- Lawn care;
- Furniture purchases;
- Personal medical expenses;
- Shopping sprees at numerous retail stores; and
- Contributions to religious organizations.

39.  The Defendants' corporate bank accounts and other records contain very little evidence of forex trading, and what little evidence of trading that exists shows unprofitable trading. U.S future commission merchant records do not reflect any forex accounts in the Defendants' names or on behalf of the Defendants. The Defendants' bank records, however, do show that nearly all of the deposits into the corporate bank accounts during the relevant period come from customer funds, and most of these are sent to the Defendants from a number of self directed retirement plan services, wherein customers in or near retirement "roll over" their lifetime IRA savings to the Defendants.

40. These same records also reveal that the Defendants are operating a Ponzi scheme, where customer funds not misappropriated to finance Hanson's and C. Hanson's lifestyles or pay customers of Hanson's prior Apollo Fund scheme, are sent back to other customers via checks singed by C. Hanson with notations on them such as "1st Qrt. Interest payment 2009," despite the fact that the Defendants own internal operating records - seized from the Defendants by the NC SD - clearly show that the corporate entities were operating at a net loss the first four months of 2009.

41. The Defendants do not disclose to actual or prospective customers that their funds are not traded or invested, but are misappropriated and used as part of a Ponzi scheme. The Defendants also do not disclose to customers that their funds are being used to pay customers of one Hanson's prior schemes, the "Apollo Fund."

42. Finally, the Defendants do not disclose to customers that all or a portion of their funds are being used to pay commissions to agents who brought new customers into the Defendants' scheme, commission that equal 1% to 5% of the referred customer's initial principal paid to the Defendants.

**F.  Fraudulent Solicitations to Customers**

43. According to individuals who were solicited by Hanson and the Queen Shoals Group's agents, customers at or near retirement are encouraged to place their IRA funds with the Queen Shoals Group by executing a "rollover" of their IRAs, from which "loans" are made to the Queen Shoals Group through the "promissory notes," "private loan agreements," and "security agreements." To further encourage customers to invest their IRA savings, the Defendants promise in their promotional material that: "IRAs ADD 1% TO ANNUAL PERCENTAGE RATE".

44. The Defendants' solicitation materials include a DVD of Hanson discussing how Queen Shoals Group purportedly guarantees profits, and generates "high returns" with "low risk" by trading forex, among other things. These and other representations and omissions discussed above are false and are employed to

fraudulently induce customers to send their retirement savings to the Defendants.

**G.    False Statements and Omissions to Customers**

45.   To conceal the Ponzi scheme, Queen Shoals Group distributes quarterly account statements to customers that falsely report the "returns" earned by customers over the prior quarter. The representations in the quarterly statements sent to customers are false because the statements: 1) fail to take into account the commission paid to agents from customers' principal investment; 2) fail to take into account the Defendants' misappropriation of customers' funds; 3) fail to disclose that the Defendants' are operating a Ponzi scheme; 4) fail to disclose that customer funds of the Queen Shoals Group are used to pay-off customers of a prior Hanson scheme; and 5) fail to take into account the millions of dollars in losses sustained by the Queen Shoals Group. The Queen Shoals Group's relevant bank records shows that little or no "forex" trading purportedly made under any one of the three investment strategies takes place. Instead, the Defendants' corporate bank account records show that customer funds are used to make the personal purchases described previously.

46.   C. Hanson is the signatory on all of the Queen Shoals Group's bank accounts at Bank of America, and signs each check used to pay "quarterly interest payments" to customers, in addition to signing all of the checks issued to pay the Queen Shoals Group's agents their commissions. She is also the signatory on the bank accounts of the Relief Defendants. C. Hanson also has an office in the business premises of the Queen Shoals Group, and was present when the NC SD undercover special agent was being solicited in the offices of the Defendants.

**H.    Hanson is a Controlling Person of the Queen Shoals Group**

47.   The documents seized by the NC SD on May 28, 2009 reveal that Hanson is in control of the day-to-day business operations of the Queen Shoals Group. Hanson signed the lease for the offices located at 8520 Cliff Cameron Drive, Suite 150, Charlotte, North Carolina 28269. Hanson is personally

responsible for the content of the Queen Shoals Group's website, *www.queenshoals.com*. He hired the administrative employees that worked in the Charlotte office. In the DVD given to prospective customers, Hanson is shown in a video explaining how he set up the purported "proprietary trading strategies" used to trade forex, and that he is the manager of the Queen Shoals Group. Hanson also explains how customers are guaranteed profits by use of so-called "non-depletion accounts."

## I.    Jurisdiction and Venue

48.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2).

49.    This Court has personal jurisdiction over the Defendants and Relief Defendants, who acknowledge service of the Summons and Complaint and consent to the Court's jurisdiction over each of them.

50.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that the Defendants and Relief Defendants are found in, inhabit, and/or transact business in this district, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this district, among other places.

## K.    Conclusions of Law

51.    By the conduct described in Part III above, Defendants violated Sections 4b(a)(2)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

52.    By the conduct described in Part III above, Hanson and C. Hanson, and other agents of Queen Shoals Group, committed the acts and omissions described herein within the course and scope of their employment at or agency with Queen Shoals Group; therefore, Queen Shoals Group are liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2009), for violations of the Act committed by Hanson and C. Hanson.

53.    By the conduct described in Part III above, Hanson is a controlling person of Queen Shoals Group, and failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations. Hanson is therefore liable for the unlawful conduct of C. Hanson and Queen Shoals Group and their violations of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

54.    Relief Defendants Secure Wealth Fund, LLC; Heritage Growth Fund, LLC; Dominion Growth Fund, LLC; Two Oaks Fund, LLC; Dynasty Growth Fund, LLC; and Queen Shoals Group, LLC, who are not charged with violations of the Act and/or Regulations, each received funds and assets from Defendants to which they hold no legitimate interest or entitlement and that were derived from Defendants' fraudulent and violative acts. The Relief Defendants therefore must return and repay these funds.

**IV.**

**<u>ORDER OF PERMANENT INJUNCTION AND ANCILLARY RELIEF</u>**

**IT IS HEREBY ORDERED THAT:**

55.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Defendants are permanently restrained, enjoined, and prohibited from directly or indirectly:

a.    cheating or defrauding or attempting to cheat or defraud other persons in or in connection with any order to make, or the making of any contract of sale of any commodity in interstate commerce or for future delivery, made, or to be made for or on behalf of any other person in violation of Section 4b(a)(2)(A) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A);

b.    willfully making or causing to be made to such other person any false report or false statement or willfully entering or causing to be entered for others any false record in violation of Section 4b(a)(2)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(B); and/or

c.    willfully deceiving or attempting to deceive any other persons by any means whatsoever in

regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such persons in violation of Section 4b(a)(2)(C) of the Act, to be codified at 7 U.S.C. § 6b(a)(2) (C).

56.     The Defendants are permanently restrained, enjoined, and prohibited from directly or indirectly engaging in

a.     trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006);

b.     entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and/or 2(c)(2)(C)(i) of the Act as amended by the CRA) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

c.     having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

d.     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

e.     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

f.     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2009); and/or

g.      acting as a principal (as that term is defined in Regulation 3.1(a)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2009).

57.      The injunctive provisions of this Order shall be binding upon the Defendants, upon any person who acts in the capacity of an agent, employee, representative, and/or assign of the Defendants and upon any person who receives actual notice of this Order, by personal service or otherwise, insofar as he or she is acting in active concert or participation with the Defendants.

**V.**

**RESTITUTION, CIVIL MONETARY PENALTY AND OTHER EQUITABLE RELIEF**

**IT IS FURTHER ORDERED THAT:**

58.      The Defendants shall comply fully with the following terms, conditions and obligations relating to the payment of restitution and a civil monetary penalty.  The equitable relief provisions of this Order shall be binding upon the Defendants and any person who is acting in the capacity of officer, agent, employee, servant, or attorney of the Defendants, and any person acting in active concert or participation with the Defendants and those equitable relief provisions that relate to restitution shall be binding on any financial institutions listed herein or holding frozen funds or assets of the Defendants, who receives actual notice of this Order by personal service or otherwise.

**A.      RESTITUTION**

59.      Defendants, jointly and severally, shall make full restitution, plus pre-judgment and post-judgment interest, to all persons who gave funds, either directly or indirectly, to Defendants as a result of the course of illegal conduct alleged in the Complaint.  The restitution amount is to be determined at a later date by agreement between the CFTC and the Defendants.

**B.** **CIVIL MONETARY PENALTY**

60.     The Defendants, jointly and severally, shall pay a civil monetary penalty, plus post-judgment interest. The amount of the civil monetary penalty is to be determined at a later date by agreement between the CFTC and the Defendants.

**C.** **DISGORGEMENT BY RELIEF DEFENDANTS**

61.  ·    The Relief Defendants shall disgorge all ill gotten gains received from the Defendants. The amount of the Relief Defendants' disgorgement obligation is to be determined at a later date by agreement between the CFTC and the Relief Defendants.

**D.** **PROVISIONS RELATED TO MONETARY SANCTIONS**

62.     <u>Procedure</u>: The Court shall determine the procedure for payment and distribution of restitution, civil monetary penalties at a later date.

63.     <u>Partial Payments</u>: Any acceptance by the Commission of partial payment of Defendants' civil monetary penalty or restitution obligations, or Relief Defendants' restitution obligations shall not be deemed a waiver of their respective requirement to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

64.     <u>Satisfaction</u>: Upon full satisfaction of the Defendants' restitution and civil monetary penalty obligations, satisfaction of judgment will be entered as to the Defendants. Satisfaction of judgment will b entered with respect to any Relief Defendant that satisfies in full its disgorgement obligation.

65.     <u>Interest</u>: Pre-judgment interest shall be determined by using the underpayment rate established quarterly by the Internal Revenue Service pursuant to 26 U.S.C. § 662(a)(2) from June 18, 2008 to the date of this Order. Post-judgment interest shall be determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961(a).

**VI.**

## MISCELLANEOUS PROVISIONS

66.    Notices: All notices required to be given by any provision in this Order shall be sent

certified mail, return receipt requested, as follows:

Notice to Commission:

Director of Enforcement
Commodity Futures Trading
Commission
1155 21ˢᵗ Street N.W.
Washington, DC 20581

Timothy J. Mulreany
Division of Enforcement
Commodity Futures Trading
Commission
1155 21ˢᵗ Street N.W.
Washington, DC 20581

Notice to Defendants:

William R. Terpening
Attorney at Law
Anderson Terpening PLLC
409 East Blvd.
Charlotte, NC 28203
704.372.7370 (office)

Daniel Bishop
Attorney at Law
Bishop, Capitano & Moss
4521 Sharon Road, Suite 350
Charlotte, North Carolina 28211
704.716.1200 (office)

67.    Entire Agreement and Amendments: This Order incorporates all of the terms and conditions

of the settlement among the parties hereto. Nothing shall serve to amend or modify this Order in any

respect whatsoever, unless: (1) reduced to writing; (2) signed by all parties hereto; and (3) approved by

order of this Court.

68.    Invalidation: If any provision of this Order or the application of any provisions or

circumstances is held invalid, the remainder of the Order and the application of the provision to any other

person or circumstance shall not be affected by the holding.

69. <u>Waiver</u>: The failure of any party hereto or of any customer at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Order. No waiver in one or more instances of the breach of any provision contained in this Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Order.

70. <u>Acknowledgements</u>: Upon being served with copies of this Order after entry by the Court, Defendants and Relief Defendants shall sign acknowledgments of such service and serve such acknowledgments on the Court and the Commission within seven (7) calendar days.

71. <u>Authorization</u>: The individuals signing this Order on behalf of the corporate Defendants and Relief Defendants hereby warrant that they are officers of the respective Defendant and/or Relief Defendant, that this Order has been duly authorized by respective Defendant and/or Relief Defendant, and that they have been duly empowered to sign and submit this Order on behalf of respective Defendant and/or Relief Defendant.

72. <u>Continuing Jurisdiction of this Court</u>: This Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this *Consent*

*Order of Settlement, Permanent Injunction and Other Equitable Relief.*

**ORDERED AND ADJUDGED:**

**DONE AND ORDERED** in Chambers at Charlotte, North Carolina, this 7⁷ day of

August, 2009.

_____
United States District Judge